UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/23/19

GENNARO SERVILLO JR.,              :

                Plaintiff,         :        18 Civ. 7118 (HBP)

     -against-                     :        OPINION
                                            AND ORDER
NANCY A. BERRYHILL,                :
Commissioner of Social Security
                                   :

                Defendant.         :

---------------------------------X

          PITMAN, United States Magistrate Judge:

I.  Introduction

          Plaintiff brings this action pro se pursuant to section
205(g) of the Social Security Act (the "Act"), 42 U.S.C. §
405(g), seeking judicial review of a final decision of the
Commissioner of Social Security ("Commissioner") denying his
application for supplemental secure income ("SSI") and disability
insurance benefits ("DIB").  All parties have consented to my
exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c).
Plaintiff and the Commissioner have both moved for judgment on
the pleadings pursuant to Rule 12(c) of the Federal Rules of
Civil Procedure (Docket Item ("D.I.") 23, 26).[1]  For the reasons

---

[1]Plaintiff filed two documents on March 6, 2019 entitled
"Motion Requesting Remand" ((D.I. 26) ("Pl. Memo. 1")) and
"Response to Motion for Judgment on the Pleadings" ((D.I. 27)
("Pl. Memo. 2")).  Plaintiff then served an additional two-page
                                        (continued...)

set forth below, the Commissioner's motion is granted and plaintiff's motion is denied.

II.  Facts[2]

  A.  Procedural Background

        On January 26, 2015, plaintiff filed an application for SSI and DIB, alleging that he became disabled on January 22, 2015 due to stomach ulcers, migraines, anxiety, back pain, depression, arthritis and fibromyalgia[3] (Tr. 280-81, 501).  After his application for benefits was initially denied on March 31, 2015, he requested, and was granted, a hearing before an administrative law judge ("ALJ") (Tr. 290, 361).

---

[1](...continued)
memoranda on the Commissioner on April 9, 2019 entitled "Memorandum of Law in Support of Remand Request."  At my request, the Commissioner then filed this document on ECF ((D.I. 32) ("Pl. Memo. 3")).  Given plaintiff's pro se status, I shall consider these three documents as plaintiff's application for judgment on the pleadings.

[2]I recite only those facts relevant to my resolution of the pending motions.  The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (see Notice of Filing for Administrative Record, dated Nov. 8, 2018 (D.I. 18) ("Tr.") more fully sets out plaintiff's medical history.

[3]Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues.  Fibromyalgia Overview, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780 (last visited Sept. 17, 2019).

On April 25, 2017, plaintiff and his attorney appeared before ALJ Michael J. Stacchini for a hearing at which plaintiff and a vocational expert testified (Tr. 245-68). On November 28, 2017, the ALJ held a supplemental hearing, at plaintiff's counsel's request, after plaintiff's counsel obtained additional medical evidence (Tr. 271-79, 570). Plaintiff appeared and testified at this supplement hearing (Tr. 271-79). On December 13, 2017, the ALJ issued his decision finding that plaintiff was not disabled (Tr. 10-21). This decision became the final decision of the Commissioner on June 21, 2018 when the Appeals Council denied plaintiff's request for review (Tr. 1-3). Plaintiff timely commenced this action on August 7, 2018 seeking review of the Commissioner's decision (Complaint, dated Aug. 7, 2018 (D.I. 2) ("Compl.")).

B.  Social Background

Plaintiff was born on May 5, 1990 and was 24 years old at the time he filed his application for SSI and DIB (Tr. 281, 468). Plaintiff lives in an apartment in New Rochelle, New York (Tr. 249, 516). Plaintiff has a high school education and has no past work history (Tr. 494-502).

In his "Function Report", dated December 2, 2015, plaintiff stated that his daily activities included cooking, bathing, watching television, playing video games, going out to

the movies, shopping and walking his dog, but that he sometimes had difficulty with these activities if he was experiencing pain (Tr. 517-20). Plaintiff further stated that he regularly went to doctors appointments, the supermarket, the pharmacy and restaurants (Tr. 521). Plaintiff claimed in his report that he no longer communicated with his family because they did not believe his pain was real; however, at the hearing, plaintiff testified that he has regular contact and good relationships with his friends and family (Tr. 252, 521). Plaintiff also claimed that he had been suffering from anxiety his entire life (Tr. 527).

## C.  Medical Background

### 1.  Medical Records Pre-Dating the Relevant Time Period

#### a.  Dr. Theodore N. Keltz

Plaintiff visited Dr. Theodore N. Keltz, a cardiologist, on January 13, 2011 and reported persistent chest pain (Tr. 651). Plaintiff's physical examination was normal, and Dr. Keltz noted that his cardiac status was good (Tr. 651-52). Dr. Keltz opined that plaintiff's persistent chest pain may be the result of arthritis that developed after plaintiff's earlier sternal surgery (Tr. 652). Given plaintiff's normal examination, Dr. Keltz did not think any further cardiac testing was necessary (Tr. 652).

Plaintiff visited Dr. Keltz again on August 1, 2011 and reported persistent chest and foot arch pain (Tr. 649-50). Plaintiff's physical examination was normal, and Dr. Keltz found no objective evidence of acute cardiac disease (Tr. 649-50).

Plaintiff did not visit Dr. Keltz again until November 25, 2013 and reported occasional chest palpitations when he was in the supine position, but that his chest pain seemed to be improving (Tr. 682). Plaintiff's physical examination, sensations and reflexes were normal (Tr. 683). Dr. Keltz opined that plaintiff was in good health, but ordered an echocardiogram[4] in light of plaintiff's complaint of chest palpitations (Tr. 683). This echocardiogram was conducted on December 9, 2013 and was normal (Tr. 680, 691).

Plaintiff visited Dr. Keltz again on November 3, 2014 and reported occasional chest pain and general aches and pains throughout his body (Tr. 680). Plaintiff's physical examination, sensations and reflexes were normal (Tr. 681). Dr. Keltz found that plaintiff did not have any symptoms to indicate significant cardiovascular pathology and did not recommend any cardiac testing (Tr. 681).

---

[4]An echocardiogram is a graphic outline of the heart's movement. During an echo test, ultrasound from a hand-held wand placed on the chest provides pictures of the heart's valves and chambers to evaluate the pumping action of the heart. Echocardiogram, The Cleveland Clinic, available at, https://myclevelandclinic.org/health/diagnostics/16947-echocardiogram (last visited Sept. 17, 2019).

b. Dr. Richard Gottfried

Plaintiff visited Dr. Richard Gottfried, an internist, on July 19, 2011 complaining of chest pain and intermittent migraines (Tr. 627). Plaintiff's physical and neurological examinations were normal (Tr. 628-29). Dr. Gottfried diagnosed plaintiff with chest pain, palpitations, migraines and gastroesophageal reflux disease ("GERD"),[5] and recommended medication (Tr. 629-30).

Plaintiff visited Dr. Gottfried again on August 15, 2011 and reported that he continued to experience sharp pains in his chest and left leg (Tr. 623). Plaintiff's physical and neurological examinations were normal and Dr. Gottfried noted that plaintiff appeared to be in good health (Tr. 624-25). Dr. Gottfried diagnosed plaintiff with chest and muscle pain, and continued to recommend pain medication (Tr. 625).

Plaintiff visited Dr. Gottfried again on September 12 and October 11, 2011 and reported that his condition remained unchanged (Tr. 615, 619). Plaintiff's physical and neurological examinations during these visits were normal (Tr. 616-17, 620).

---

[5]GERD occurs when stomach acid frequently flows back into the esophagus causing irritation. Gastroesophageal Reflux Disease (GERD), Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (last visited Sept. 17, 2019).

Dr. Gottfried continued to diagnose plaintiff with chest and muscle pain (Tr. 617, 621).

Plaintiff next visited Dr. Gottfried on November 30, 2011 and reported continued chest pain (Tr. 611). Dr. Gottfried noted that plaintiff appeared to be depressed and slightly overweight during this visit, but that his physical and neurological examinations were normal (Tr. 612). Dr. Gottfried continued to diagnose plaintiff with chest pain, and recommended medication (Tr. 613).

Plaintiff visited Dr. Gottfried again on March 14, 2012 and again reported continued chest pain (Tr. 609). Dr. Gottfried noted that plaintiff appeared to be slightly anxious during this visit, but that his physical and neurological examinations were normal (Tr. 608-09). Dr. Gottfried diagnosed plaintiff with muscle pain (Tr. 609).

Plaintiff next visited Dr. Gottfried on May 29, 2012 and reported persistent chest pain that increased when he got up after lying down (Tr. 599). Dr. Gottfried again noted that plaintiff appeared to be depressed and overweight during this visit, but that his physical and neurological examinations were normal (Tr. 600-01). Dr. Gottfried diagnosed plaintiff with

chest pain, chronic pain syndrome, shoulder pain and chronic pericarditis,[6] and recommended medication (Tr. 601).

Plaintiff visited Dr. Gottfried again on June 13, 2012 and reported muscle spasms that spread from the left side of his chest and left arm into the left side of his neck (Tr. 595). Dr. Gottfried noted that plaintiff appeared to be depressed and overweight during this visit, but that his physical and neurological examinations were normal (Tr. 596-97). Dr. Gottfried diagnosed plaintiff with chest pain and muscle spasms (Tr. 597).

Plaintiff next visited Dr. Gottfried on July 18, 2012 and reported fatigue, migraines, insomnia and pain that radiated from his chest into his legs and feet (Tr. 591). Plaintiff's physical and neurological examinations were normal (Tr. 592-93). Dr. Gottfried noted that plaintiff appeared to be in fair health, but that he was overweight and deconditioned (Tr. 592). Dr. Gottfried diagnosed plaintiff with high blood pressure and migraines, and recommended medication and a consultation with a rheumatologist (Tr. 593).

---

[6]Pericarditis is swelling and irritation of the pericardium, the thin saclike membrane surrounding the heart. Pericarditis often causes chest pain when the irritated layers of the pericardium rub against each other. Pericarditis, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/pericarditis/symptoms-causes/syc-20352510 (last visited Sept. 17, 2019).

c.  Dr. Maria Audrie DeJesus

Plaintiff was examined by Dr. Maria Audrie DeJesus, a neurologist, on May 31, 2012 (Tr. 647-48).  Plaintiff reported that he had been experiencing intermittent chest pain for the past four years and had a history of high blood pressure, acid reflux and migraines (Tr. 647).  Dr. DeJesus noted mild tenderness over plaintiff's left pectoral area and diagnosed plaintiff with left pectoral pain (Tr. 648).  Dr. DeJesus recommended a brain MRI to determine the source of plaintiff's pain (Tr. 648). Plaintiff underwent this MRI on June 2, 2012, which revealed three areas of subcortical white matter that were "nonspecific findings and can be seen in but not limited to migraines, demyelination, hypertension or gliosis" (Tr. 1249).

d.  New Rochelle Radiology

Plaintiff underwent an MRI of his cervical spine[7] on September 4, 2012, which revealed straightening of the cervical spine consistent with possible muscle spasms and mild degenera-

---

[7]The cervical region of the spine is located closest to the skull and is made up of vertebrae C1 through C7.  Anatomy of the Human Spine, Mayfield Brain & Spine, available at https://www.mayfieldclinic.com/PE-AnatSpine.htm (last visited Sept. 17, 2019).

tive disc disease, but no disc bulges or significant stenosis[8] (Tr. 1248).

Plaintiff underwent an MRI of his lumbar spine[9] on February 13, 2013, which revealed a mild disc bulge without stenosis at L4-L5 and L5-S1 (Tr. 1250).

Plaintiff underwent an MRI of his thoracic spine[10] on April 11, 2013, which revealed a small disc protrusion at T8-T9, but no evidence of disc herniation or spinal stenosis (Tr. 61).

### e. Alssaro Counseling Services

Plaintiff attended 30 counseling sessions at Alssaro Counseling Services from July 9, 2013 through April 24, 2014 (Tr. 985-99, 1179-1207). Plaintiff expressed feelings of depression, frustration and social isolation during these counseling sessions, and licensed social worker Adolfo Marrero opined that plaintiff was suffering from depression and problems with his social environment (Tr. 985-99, 1179-1207).

---

[8]Spinal stenosis is the narrowing of spaces within the spinal cord, which can put pressure on nerves. Spinal Stenosis Overview, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Sept. 17, 2019).

[9]The lumbar region of the spine is located below the thoracic region and is made up of vertebrae L1 through L5. Anatomy of the Human Spine, supra.

[10]The thoracic region of the spine is located below the cervical region and consists of vertebrae T1 through T12. Anatomy of the Human Spine, supra.

f.  Dr. Joseph Cole

Plaintiff visited Dr. Joseph Cole, an orthopedist, on March 21, 2014 and reported right wrist and forearm pain (Tr. 778).  Plaintiff further reported that he had a history of cysts in his right hand (Tr. 778).  Plaintiff exhibited full muscle strength and range of motion in all extremities and his reflexes were normal (Tr. 779-80).  Dr. Cole noted that plaintiff had multiple points of tenderness with palpitation throughout his body (Tr. 779-80).  Dr. Cole diagnosed plaintiff with right forearm tendinitis[11] and fibromyalgia (Tr. 780).  Dr. Cole recommended medication and referred plaintiff to a rheumatologist (Tr. 780).

Plaintiff visited Dr. Cole again on April 18, 2014 and reported occasional back pain, but that his right arm pain had completely resolved (Tr. 782).  Plaintiff exhibited full muscle strength in all extremities and his reflexes and sensations were normal (Tr. 783-84).  Plaintiff had some mild restrictions with his cervical spine range of motion (Tr. 783).  Dr. Cole diagnosed

---

[11]Tendinitis is inflammation or irritation of a tendon — the thick fibrous cords that attach muscle to bone.  The condition causes pain and tenderness just outside the joint. Tendinitis, Mayo Clinic, available at, https://www.mayoclinic. org/diseases-conditions/tendinitis/symptoms-causes/syc-20378243 (last visited Sept. 18, 2019).

plaintiff with fibromyalgia and recommended medication, home
exercises and yoga (Tr. 784-85).

Plaintiff visited Dr. Cole again on September 26, 2014
and reported back pain that radiated into his chest and abdomen
(Tr. 663). Plaintiff exhibited full muscle strength in all
extremities and his reflexes and sensations were normal (Tr. 664-
66). He had mild restrictions in his range of motion in his
lumbar spine (Tr. 666). Dr. Cole diagnosed plaintiff with a
lumbar strain and recommended medication and possible physical
therapy (Tr. 667).

### g. Dr. Billy Yung

Plaintiff visited Dr. Billy Yung, a neurologist, on
July 8, 2014 and reported pain behind his ears that radiated down
both sides of his neck and frequent nosebleeds (Tr. 771).
Plaintiff's physical and neurological examinations were normal
(Tr. 773-74). Dr. Yung diagnosed plaintiff with neck pain and
migraines, and recommended medication (Tr. 775).

Plaintiff visited Dr. Yung again on November 11, 2014
and reported intermittent migraines and associated neck pain (Tr.
740). Plaintiff's physical and neurological examinations were
normal (Tr. 741-43). Dr. Yung diagnosed plaintiff with migraines
and recommended medication (Tr. 744).

Plaintiff visited Dr. Yung again on January 13, 2015 and reported that his headaches had improved with medication, but that he was experiencing joint pain in his knees and ankles (Tr. 756). Plaintiff's physical and neurological examinations were normal (Tr. 756-59). Dr. Yung diagnosed plaintiff with migraines and continued to recommend medication (Tr. 759-60).

### h. Dr. Jane Wachs

Plaintiff visited Dr. Jane Wachs, a rheumatologist, on August 4, 2014 and reported pain in his chest, legs and abdomen (Tr. 705). Plaintiff also reported feelings of depression, but denied anxiety, insomnia or thoughts of suicide (Tr. 706). Plaintiff presented with normal gait[12] and exhibited full range of motion in his arms and legs and full muscle strength (Tr. 707). Plaintiff's neurological examination was normal (Tr. 707). Dr. Wachs also found some tender areas in plaintiff's chest (Tr. 707). Dr. Wachs diagnosed plaintiff with fibromyalgia and depressive disorder, and recommended that plaintiff continue with pain medication and that he visit a psychiatrist (Tr. 708).

Plaintiff visited Dr. Wachs again on November 25, 2014 and reported pain in his elbows, knees, arms and shoulders, fatigue and migraines that were improving with medication (Tr.

---

[12]Gait refers to the manner and style of walking. See See Dorland's Illustrated Medical Dictionary, 753 (32nd ed. 2012) ("Dorland's").

700). Plaintiff presented with normal gait and exhibited full range of motion in his arms and legs and full muscle strength (Tr. 703). Plaintiff's neurological examination was normal (Tr. 703). Dr. Wachs also found some tender points associated with plaintiff's fibromyalgia (Tr. 703). Dr. Wachs diagnosed plaintiff with fibromyalgia and depressive disorder (Tr. 704). Dr. Wachs recommended that plaintiff increase his pain medication to better control his fibromyalgia symptoms, but plaintiff refused (Tr. 704). Dr. Wachs also recommended that take an antidepressant and opined that improvement in plaintiff's depression would improve his fibromyalgia (Tr. 704).

Plaintiff next visited Dr. Wachs on January 19, 2015 and reported fatigue and pain in his arms and legs (Tr. 709). Plaintiff further reported that his migraines had improved (Tr. 709). Plaintiff presented with normal gait and exhibited full range of motion in his arms and legs and full muscle strength, but was extremely tender to all points of palpation throughout his body (Tr. 711-12). Dr. Wachs continued to diagnose plaintiff with fibromyalgia and depressive disorder (Tr. 712). Dr. Wachs noted that she was unable to treat plaintiff further because he was refusing to treat his depression and she believed that treating his depression would have a direct positive effect on his fibromyalgia (Tr. 712). Dr. Wachs discussed this recommendation at length with plaintiff (Tr. 712).

14

2. Medical Records for
   the Relevant Time Period

   a. Dr. Joseph Cole

Plaintiff visited Dr. Cole again on January 23, 2015
and reported lower back pain that occasionally radiated into his
legs (Tr. 669). Plaintiff exhibited full muscle strength in all
extremities and his reflexes and sensations were normal (Tr. 669-
72). He had mild restrictions in his range of motion in his
lumbar spine (Tr. 671). Dr. Cole diagnosed plaintiff with lumbar
facet syndrome[13] and ordered a lumbar spine MRI (Tr. 672).

Plaintiff visited Dr. Cole again on March 20, 2015 and
reported back pain that radiated into his legs (Tr. 1361).
Plaintiff exhibited full muscle strength in all extremities and
his reflexes and sensations were normal (Tr. 1362-363). Plain-
tiff exhibited full range of motion in his hips and shoulders,
but had some mild restrictions in his cervical and lumbar spine
(Tr. 1362-363). Dr. Cole diagnosed plaintiff with lumbar facet
syndrome, and recommended pain medication and home exercises (Tr.
1364).

---

[13]Lumbar facet syndrome is a painful irritation of the
posterior area of the lumbar spine. Swelling from the
surrounding structures can cause pain due to an irritation of the
nerve roots. Lumbar Facet Syndrome, Physiopedia, available at,
https://www.physio-pedia.com/lumbar_facet_syndrome (last visited
Sept. 18, 2019).

Plaintiff next visited Dr. Cole on April 17, 2015 and reported lower back pain that radiated into his stomach (Tr. 1381). Plaintiff exhibited full muscle strength in all extremities and his reflexes and sensations were normal (Tr. 1382-383). Plaintiff exhibited full range of motion in his hips and shoulders, but had some mild restrictions in his cervical and lumbar spine (Tr. 1382-383). Dr. Cole continued to diagnose plaintiff with lumbar facet syndrome (Tr. 1384). Dr. Cole recommended medication and physical therapy, and ordered a lumbar spine MRI (Tr. 1384).

Plaintiff underwent this MRI on April 22, 2015, which again revealed a mild disc bulge without stenosis at L4-L5 and L5-S1 (Tr. 1265).

Plaintiff visited Dr. Cole again on May 22, 2015 and reported back pain (Tr. 1388). Plaintiff exhibited full muscle strength in all extremities and his reflexes and sensations were normal (Tr. 1389-390). Plaintiff exhibited full range of motion in his hips and shoulders, but had some mild restrictions in his cervical and lumbar spine (Tr. 1389-390). Plaintiff's straight leg raising tests were negative bilaterally (Tr. 1390). Dr. Cole continued to diagnose plaintiff with lumbar facet syndrome, and recommended medication, physical therapy and cortisone injections if plaintiff's pain did not improve (Tr. 1391).

### b.  Dr. Jane Wachs

Plaintiff returned to Dr. Wachs on January 25, 2015 and reported fatigue and pain in his legs and arms (Tr. 1348). Plaintiff stated that his migraines had improved and that he was no longer suffering from depression (Tr. 1348).  Plaintiff presented with normal gait and exhibited full range of motion in his arms and legs and full muscle strength, but was extremely tender to all points of palpation throughout his body (Tr. 1350). Dr. Wachs continued to diagnose plaintiff with fibromyalgia and depressive disorder, and recommended pain medication and that plaintiff seek treatment for his depression (Tr. 1350-51).

### c.  Dr. Michael Agastin

Plaintiff visited Dr. Michael Agastin, his primary care physician, on January 28, 2015 and reported pain in his back, right knee and right elbow (Tr. 805).  Plaintiff further reported that he no longer wished to see Dr. Wachs because he disagreed with her diagnosis of depression (Tr. 805).  Dr. Agastin noted that plaintiff had a "mildly depressed mood," but that his physical and neurological examinations were normal (Tr. 806-07). Dr. Agastin diagnosed plaintiff with fibromyalgia and recommended that he consult with a psychiatrist, a rheumatologist and a pain management specialist to better manage his symptoms (Tr. 807-08).

Plaintiff visited Dr. Agastin again on March 24, 2015 for his annual physical (Tr. 1365). Plaintiff's physical and neurological examinations were normal and he exhibited a full range of motion and muscle strength in all extremities (Tr. 1367-368). Dr. Agastin diagnosed plaintiff with fibromyalgia and recommended that he continue consulting with a rheumatologist (Tr. 1366).

Plaintiff next visited Dr. Agastin on March 31, 2015 and reported left foot pain (Tr. 1370). Plaintiff's physical and neurological examinations were normal, except for tenderness in his left foot (Tr. 1371). Dr. Agastin diagnosed plaintiff with possible tendinitis or possible Morton's neuroma,[14] and recommended that plaintiff consult with a podiatrist (Tr. 1371).

Plaintiff visited Dr. Agastin again on July 15, 2015 and reported chest palpitations (Tr. 1414). Plaintiff's physical and neurological examinations were normal (Tr. 1415). Dr. Agastin diagnosed plaintiff with occasional palpitations, high blood pressure and depression, and recommended medication (Tr. 1416).

---

[14]Morton's neuroma involves a thickening of the tissue around one of the nerves leading to the toes, which can cause a sharp, burning pain in the ball of the foot. Morton's Neuroma, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/mortons-neuroma/symptoms-causes/syc-20351935 (last visited Sept. 18, 2019).

Plaintiff next visited Dr. Agastin on April 15, 2016 and reported pain with deep breathing that felt similar to pericarditis (Tr. 1456). Plaintiff's physical and neurological examinations were normal (Tr. 1457-458). Dr. Agastin diagnosed plaintiff with pericarditis and ordered a chest X-ray, which revealed no acute pulmonary disease (Tr. 1458, 1675).

Plaintiff visited Dr. Agastin again on May 25, 2016 and reported pain in the left side of his chest, arms and legs (Tr. 1459). Again, plaintiff's physical and neurological examinations were normal (Tr. 1460). Dr. Agastin diagnosed plaintiff with fibromyalgia and recommended medication, diet and exercise and home stretches (Tr. 1460).

Plaintiff next visited Dr. Agastin on August 8, 2016 and reported intermittent pain in his arms and legs (Tr. 1474). Plaintiff's physical and neurological examinations were normal (Tr. 1475). Dr. Agastin diagnosed plaintiff with fibromyalgia and migraines, and recommended medication (Tr. 1476).

Plaintiff visited Dr. Agastin again on August 24, 2016 and reported pain in his back and forearms (Tr. 1477). Plaintiff's physical and neurological examinations remained normal (Tr. 1478-479). Dr. Agastin diagnosed plaintiff with fibromyalgia, and recommended medication, forearm splints and consultations with neurology and rheumatology (Tr. 1479).

Plaintiff next visited Dr. Agastin on December 19, 2016 and reported foot and leg pain (Tr. 1500). Plaintiff exhibited a full range of motion and muscle strength in all extremities, and his sensations and reflexes were normal (Tr. 1502). Dr. Agastin diagnosed plaintiff with ankle and neck pain, and recommended exercise and multivitamins (Tr. 1503).

Plaintiff visited Dr. Agastin again on January 5, 2017 and reported a ganglion cyst[15] in his right wrist (Tr. 1504). Dr. Agastin referred plaintiff to a hand surgeon (Tr. 1505).

Plaintiff next visited Dr. Agastin on February 21, 2017 and reported intermittent muscle pains and cramps (Tr. 1227). Plaintiff's physical and neurological examinations were still normal and Dr. Agastin diagnosed plaintiff with fibromyalgia (Tr. 1228).

Dr. Agastin also submitted a medical source statement on February 21, 2017 in which he opined that plaintiff could occasionally lift and carry objects that weighed up to ten pounds and that he could only stand, sit or walk for 30 minutes (Tr. 971-72). Dr. Agastin further opined that plaintiff could occa-

---

[15]Ganglion cysts are noncancerous lumps that commonly develop along the tendons or joints of the wrists. They are typically round or oval and are filled with a jellylike fluid. Ganglion cysts can be painful if they press on a nearby nerve and can sometimes interfere with joint movement. Ganglion Cyst, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/ganglion-cyst/symptoms-causes/syc-20351156 (last visited Sept. 18, 2019).

sionally reach, push, pull, finger and handle objects, climb
stairs, stoop and balance, but that he could never climb ladders
or scaffolds, kneel, crouch or crawl (Tr. 973-74). Dr. Agastin
also noted that plaintiff was able to go shopping, travel without
assistance, use public transportation, prepare simple meals, take
care of his personal hygiene and sort and handle files (Tr. 976).

Dr. Agastin filled out a "Disability Impairment
Questionnaire" on November 20, 2017 (Tr. 52-56). In this ques-
tionnaire, Dr. Agastin opined that plaintiff could sit in one
position for four hours and could stand for two hours out of an
eight-hour work day (Tr. 54). He further opined that plaintiff
could occasionally lift and carry objects up to ten pounds and
that he did not have "significant limitations" with his ability
to reach for, handle or finger objects (Tr. 54-55). Dr. Agastin
estimated that plaintiff would need to take two to five unsched-
uled breaks during an eight-hour work day and that he would be
absent from work approximately two to three times per month
because of his symptoms (Tr. 55-56).

d. Dr. Andrew Francella

Plaintiff underwent a colonoscopy with Dr. Andrew
Francella, a gastroenterologist, on January 29, 2015 after he
reported that he was experiencing rectal bleeding (Tr. 885). As

a result of this procedure, Dr. Francella diagnosed plaintiff with gastritis[16] and a hiatal hernia[17] (Tr. 886).

Plaintiff followed up with Dr. Francella on April 15, 2015 and reported that his rectal bleeding and acid reflux symptoms had improved with medication (Tr. 896). Dr. Francella diagnosed plaintiff with colitis,[18] GERD, obesity and rectal bleeding, but noted that plaintiff's condition had improved (Tr. 898). Dr. Francella recommended that plaintiff continue with his medication and have a follow-up colonoscopy in one year (Tr. 898).

Plaintiff visited Dr. Francella again on October 7, 2015 and reported no new gastrointestinal symptoms, but did

_____

[16]Gastritis is a general term for a group of conditions that involve the inflammation of the lining of the stomach. The inflammation of gastritis is most often the result of infection with the same bacterium that causes most stomach ulcers. Gastritis, Mayo Clinic, available at, https://www.mayoclinic.org/ diseases-conditions/gastritis/symptoms-causes/syc-20355807 (last visited Sept. 18, 2019).

[17]A hiatal hernia occurs when the upper part of the stomach bulges through the large muscle separating the abdomen and chest. A large hiatal hernia can allow food and acid to back up into the esophagus, leading to heartburn. Self-care measures or medications can usually relieve these symptoms. Hiatal Hernia, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/hiatal-hernia/symptoms-causes/syc-20373379 (last visited Sept. 18, 2019).

[18]Ulcerative colitis is an inflammatory bowel disease that causes long-lasting inflammation and ulcers in the digestive tract. Ulcerative Colitis, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/ulcerative-colitis/symptoms-causes/syc-20353326 (last visited Sept. 18, 2019).

report that he was experiencing a cough that he believed might be related to his acid reflux (Tr. 900). Dr. Francella diagnosed plaintiff with a chronic cough, obesity, colitis, depression and GERD, and recommended medication and an anti-reflux diet (Tr. 903-04).

Plaintiff next visited Dr. Francella on March 23, 2016 and reported intermittent reflux symptoms (Tr. 924). Dr. Francella continued to diagnose plaintiff with obesity, GERD and colitis, and recommended that plaintiff undergo a follow-up colonoscopy to assess his colitis (Tr. 927-28). Plaintiff underwent this colonoscopy on June 30, 2016; its results were normal (Tr. 1253).

Plaintiff visited Dr. Francella again on September 7, 2016 and reported no new gastrointestinal symptoms (Tr. 1483). Dr. Francella noted that plaintiff did not appear stressed or depressed during his examination and that his physical examina- tion was normal (Tr. 1485). Dr. Francella continued to diagnose plaintiff with obesity, GERD and colitis, and recommended medication and an anti-reflux diet (Tr. 1486).

Plaintiff next visited Dr. Francella on May 3, 2017 and reported that he had been under a lot of stress, which he be- lieved was exacerbating his irritable bowel syndrome (Tr. 1230). Dr. Francella diagnosed plaintiff with obesity, GERD and irrita-

ble bowel syndrome, and recommended medication and an anti-reflux diet (Tr. 1234-235).

e.  Dr. Rachael Felsenfeld

Plaintiff visited Dr. Rachael Felsenfeld, a psychiatrist, for an independent psychiatric evaluation on March 5, 2015 (Tr. 848).  Plaintiff reported that he had never been hospitalized for psychiatric treatment and that he had been going to therapy, but recently stopped because he did not believe it was helping him (Tr. 848).  Plaintiff further reported that he suffered from insomnia and felt angry and annoyed by his body pains, but denied homicidal or suicidal thoughts (Tr. 848-49).

Dr. Felsenfeld noted that plaintiff was appropriately dressed and groomed for his evaluation (Tr. 849).  She further noted that his speech was fluent, his thought process was coherent, his memory was intact, he was oriented to time and place and his judgment, insight and cognitive functioning was fair (Tr. 849-50).  However, Dr. Felsenfeld also found that plaintiff's mood was "mildly depressed" and that his concentration and attention were "mildly impaired" (Tr. 850).

Dr. Felsenfeld diagnosed plaintiff with depressive disorder (Tr. 851).  Dr. Felsenfeld opined that plaintiff had no limitations on his ability to follow and understand simple directions and instructions, perform simple tasks independently

and perform new tasks; that he had mild limitations on his ability to maintain attention and concentration, maintain a regular schedule, make appropriate decisions and relate adequately with others and that he had moderate limitations on his ability to perform complex tasks independently and appropriately deal with stress (Tr. 850). She further opined that plaintiff's psychiatric symptoms were not severe enough to interfere with his ability to function on a daily basis, but recommended that he seek psychiatric treatment (Tr. 850-51).

### f. Dr. Joseph Ha

Plaintiff visited Dr. Joseph Ha, a general surgeon, for an independent medical evaluation on March 11, 2015 (Tr. 854). Plaintiff did not report any specific pain trigger points during this examination, but reported that he was suffering from fibromyalgia, chronic colitis, migraines, poor vision, anxiety, depression, GERD and high blood pressure (Tr. 854). Plaintiff further reported that he was unable to cook, clean, do laundry or shop because it too painful for him to stand, but that he was able to bathe and dress himself and enjoyed watching television and going out to the movies (Tr. 855).

Plaintiff presented with normal gait and was able to rise from the examination table without assistance (Tr. 856). He exhibited full range of motion in his cervical spine, lumbar

spine, shoulders, hips and knees, but was only able to squat to 60% (Tr. 857). Plaintiff exhibited full muscle and grip strength and his reflexes and sensations were normal (Tr. 857).

Dr. Ha opined that plaintiff had no limitations on his ability to use his hands for fine and gross motor activity (Tr. 858). Dr. Ha further opined that plaintiff had "mild limitations" with respect to heavy lifting, carrying, squatting, kneeling, crouching, climbing stairs, walking for long distances and prolonged sitting or standing (Tr. 858).

g. Dr. Billy Yung

Plaintiff visited Dr. Yung again on April 14, 2015 and reported suffering from intermittent headaches over the preceding few months that were controlled with medication (Tr. 1373). Plaintiff exhibited full muscle strength in all extremities, except for some weakness in his thumb (Tr. 1375). His sensations were normal, but his reflexes were slightly diminished (Tr. 1375-376). Dr. Yung diagnosed plaintiff with migraines and recommended that he continue with pain medication (Tr. 1376).

Plaintiff next visited Dr. Yung on October 13, 2015 and reported that his migraines were well controlled with medication and that he had not had any headaches in the preceding few months (Tr. 1433). Plaintiff's physical and neurological examinations

were unchanged since his last visit, and Dr. Yung continued to diagnose plaintiff with migraines (Tr. 1435-436).

Plaintiff visited Dr. Yung again on February 9, 2016 and again reported that his migraines were well controlled with medication and that he had gone several months without any headaches (Tr. 1440). Plaintiff's physical and neurological examinations were unchanged since his last visit, and Dr. Yung continued to diagnose plaintiff with migraines (Tr. 1442-443).

Plaintiff next visited Dr. Yung on August 2, 2016 and reported that he had stopped his medication and was experiencing headaches again (Tr. 1469). Plaintiff's physical and neurological examinations were unchanged since his last visit (Tr. 1471). Dr. Yung continued to diagnose plaintiff with migraines, and recommended that plaintiff resume taking his medication (Tr. 1472).

Plaintiff visited Dr. Yung again on June 6, 2017 and reported mild head pain, but stated that his migraines had not reoccurred (Tr. 1525). Plaintiff exhibited full muscle strength and his reflexes and sensations were normal (Tr. 1528). Dr. Yung continued to diagnose plaintiff with migraines, and recommended medication (Tr. 1528).

## h.  Alssaro Counseling Services

Plaintiff attended approximately 75 counseling sessions at Alssaro Counseling Services from May 11, 2015 through November 1, 2017 with licensed social worker Michelle Weber (Tr. 1001-177, 1613-655).  During the majority of these sessions, plaintiff reported frustration with his doctors, low energy, low motivation and social isolation (Tr. 1001-177, 1613-655).

Weber filled out functional capacity assessment of plaintiff on March 3, 2016 in which she opined that plaintiff's physical pain was related to his depression (Tr. 1217-220). Weber opined that plaintiff had "mild limitations" with remembering locations and work-like procedures and understanding, remembering or carrying out simple instructions, and that he had "marked limitations" on his ability to maintain attention and concentration, work with others, interact with the general public, ask simple questions, accept and respond appropriately to criticism from supervisors, respond to changes in the work environment, set goals and deal with stress (Tr. 1218-220). Weber stated that she could not estimate how many days of work per month plaintiff would miss due to his symptoms, but opined that his symptoms would interfere with his ability to work on a regular basis more than 20% of the time (Tr. 1220).

Weber filled out a second functional capacity assessment of plaintiff on March 6, 2017 (Tr. 978-83). Weber stated that plaintiff had been attending bi-weekly counseling sessions and was compliant with his medication (Tr. 978). She further stated that plaintiff suffered from a loss of interest in almost all activities, decreased energy, difficulty thinking or concentrating and emotional withdrawal (Tr. 979). Weber opined that plaintiff had no limitations on his ability to understand, remember or carry out simple instructions and take ordinary precautions, but that he had "serious limitations" on his ability to work with others without being distracted, complete a normal workweek without interruptions from his psychological symptoms, perform at a consistent pace without an unreasonable number of rest periods, ask simple questions, get along with co-workers or peers, respond appropriately to changes in the workplace setting and deal with stress (Tr. 980). She further opined that plaintiff had "moderate limitations" on his ability to perform the activities of daily living and maintain concentration, persistence or pace, and that he had "marked limitations" on social functioning (Tr. 982). Weber estimated that plaintiff's symptoms would cause him to miss work approximately four times per month (Tr. 982-83).

i.  <u>Dr. Mark Weigle</u>

Plaintiff visited Dr. Mark Weigle, a physiatrist, on May 29, 2015 and reported back and joint pain that plaintiff described as a four out of ten in severity (Tr. 861). Plaintiff further reported that the pain increased after standing for approximately 30 minutes and with walking up stairs (Tr. 861). Plaintiff presented with a normal gait and exhibited full muscle strength in all extremities, except for slightly decreased motor strength in his hands (Tr. 862). Plaintiff exhibited a full range of motion in his cervical spine, but a slightly decreased range of motion in his lumbar spine (Tr. 862). His straight leg raising tests[19] were negative bilaterally and his reflexes and sensations were normal (Tr. 862). Dr. Weigle noted some tenderness and muscle spasm in plaintiff's middle back area and diagnosed him with back pain, a lumbar disc bulge without

---

[19]The straight leg raising test is used to assess patients who complain of back pain that radiates down one leg for nerve root irritation. To conduct a straight leg raising test, the patient must first lie on his or her back and completely relax the affected leg. Cupping the heel of the foot of that leg, the examiner will gently raise the leg. If the patient experiences pain when his or her leg is elevated between 30 and 60 degrees, the test is positive, indicating that root irritation is likely; if there is no sensitivity in that range, the test is negative and the patient is unlikely to be suffering from root irritation. <u>A Practical Guide to Clinical Medicine: Musculo-Skeletal Examination</u>, University of California, San Diego School of Medicine, <u>available</u> <u>at</u> https://meded.ucsd.edu/clincalmed/joints6.htm (last visited Sept. 18, 2019).

myelopathy,[20] arthritis, depression and obesity (Tr. 862-63).
Dr. Weigle recommended pain medication, a transcutaneous electrical nerve stimulation ("TENS") unit[21] and consultations with rheumatology and psychiatry (Tr. 863).

Plaintiff visited Dr. Weigle again on June 25, 2015 and reported back and joint pain, but that it had significantly improved with his use of the TENS unit (Tr. 867). Plaintiff described the pain as a two out of ten (Tr. 867). Plaintiff, again, presented with a normal gait and exhibited full muscle strength in all extremities, except for slightly decreased motor strength in his hands (Tr. 868). Plaintiff exhibited a full range of motion in his cervical spine, but a slightly decreased range of motion in his lumbar spine (Tr. 868). His straight leg raising tests were negative bilaterally and his reflexes and sensations were normal (868). Dr. Weigle did not find any muscle spasms during this examination and diagnosed plaintiff with back pain, lumbar disc bulge without myelopathy, arthritis, depression

---

[20]Myelopathy refers to functional disturbances or pathological changes in the spinal cord. Dorland's at 1221.

[21]A TENS unit helps relieve pain by delivering low-level, pulsed electrical currents that pass through the skin to the area of pain. These currents stimulate the peripheral nerves to induce pain relief. Self-care Approaches to Treating Pain, Mayo Clinic, available at, https://www.mayoclinic.org/self-care-approaches-to-treating-pain/art-20367322 (last visited Sept. 18, 2019).

and obesity (Tr. 868). Dr. Weigle recommended that plaintiff continue with his TENS unit and home exercises (Tr. 868-69).

Plaintiff next visited Dr. Weigle on July 27, 2015 and reported pain in his back, knees, legs, elbows and wrists that he described as a one out of ten (Tr. 871). Plaintiff presented with a normal gait and exhibited full muscle strength in all extremities and a full range of motion in his cervical and lumbar spine (Tr. 871-72). Dr. Weigle did not find any muscle spasms during this examination and continued to diagnose plaintiff with back pain, a lumbar disc bulge without myelopathy, arthritis, depression and obesity (Tr. 872). Dr. Weigle recommended that plaintiff continue with his TENS unit and home exercises (Tr. 872-73).

Plaintiff visited Dr. Weigle again on October 12, 2015 and reported intermittent pain in his back, knees, legs, elbows and wrists, but that he was not in any pain on the date of the examination (Tr. 875). Plaintiff presented with a normal gait and exhibited full muscle strength in all extremities (Tr. 876). Plaintiff exhibited a full range of motion in his cervical spine, but a slightly decreased range of motion in his lumbar spine (Tr. 876). His reflexes and sensations were normal, and Dr. Weigle did not find any muscle spasms during this examination (Tr. 876). Dr. Weigle continued to diagnose plaintiff with back pain, a lumbar disc bulge without myelopathy, arthritis, depression and

obesity, and recommended continued use of his TENS unit and home exercises (Tr. 876-77).

Plaintiff next visited Dr. Weigle on July 8, 2016 and reported joint pain in his knees, legs, elbows and wrists that ranged from a zero to a three out of ten depending on his level of activity (Tr. 948). Plaintiff presented with a normal gait and exhibited full muscle strength in all extremities, except for mild weakness in his hands (Tr. 949-50). Plaintiff exhibited a full range of motion in his cervical spine, but a slightly decreased range of motion in his lumbar spine (Tr. 949-50). His reflexes and sensations were normal, and Dr. Weigle did not find any muscle spasms during this examination (Tr. 949-50). Dr. Weigle continued to diagnose plaintiff with back pain, a lumbar disc bulge without myelopathy, arthritis, depression and obesity, and recommended continued use of his TENS unit and home exercises (Tr. 950-51).

Plaintiff visited Dr. Weigle again on August 11, 2016 and reported pain in his left wrist with associated swelling in his forearm, but that his other joint pain had improved (Tr. 943). Plaintiff presented with a normal gait and exhibited full muscle strength in all extremities, except for mild weakness in his hands (Tr. 944). Dr. Weigle noted tenderness and swelling in plaintiff's left wrist and opined that the swelling was due to a ganglion cyst (Tr. 944). Dr. Weigle recommend a cortisone

33

injection and, if necessary, drainage of the cyst (Tr. 945).
Plaintiff received this injection from Dr. Weigle on August 18,
2016 (Tr. 941).

### j.  Dr. Theodore N. Keltz

Plaintiff visited Dr. Keltz again on April 25, 2016 and
reported intermittent chest pain and recurrent bouts of
pericarditis (Tr. 933).  Plaintiff's physical and neurological
examinations were normal and Dr. Keltz opined that plaintiff's
pericarditis was mild since it subsided with over the counter
pain medication (Tr. 934-35).  Dr. Keltz further opined that no
new cardiac testing was necessary and recommended that plaintiff
maintain a healthy diet and follow-up with him again in one year
(Tr. 935).

Plaintiff next visited Dr. Keltz on May 18, 2017 and
reported that he was not having any recurring chest pain or
shortness of breath (Tr. 1802).  Plaintiff's physical and neuro-
logical examinations were normal, and Dr. Keltz opined that
plaintiff's cardiac health was stable (Tr. 1803-804).

Plaintiff underwent an echocardiogram with Dr. Keltz on
July 5, 2017; its results were normal (Tr. 1811-812).

D. Proceedings Before the ALJ

1. Plaintiff's Testimony

Plaintiff testified that he continued to experience pain in his chest, calves, feet, arms, wrists and hands as of the date of his hearing and that he was taking Tylenol for the pain (Tr. 253-54, 256). Plaintiff stated that he experienced migraines once or twice per month and that his back pain had significantly improved (Tr. 254-55). He testified that his colitis was controlled with medication and that he did not think his colitis would have an effect on his ability to work (Tr. 256). Plaintiff stated that he was still attending counseling sessions, but was not taking any antidepressants or anti-anxiety medications (Tr. 258-59).

Plaintiff testified that he frequently walked to supermarkets to go shopping and sometimes walked his dog for an hour around his neighborhood (Tr. 251-52). He further testified that he was able to cook, clean and do laundry (Tr. 251-52).

However, at his supplemental hearing, plaintiff testified that he had difficulty cleaning because of his muscle pain (Tr. 274). He further testified that he was only able to sit or stand for 15 to 20 minutes at a time and was only able to walk two to three blocks (Tr. 275-76)

35

## 2. Vocational Expert's Testimony

Vocational expert Kristin Panella ("the VE") also testified at the hearing. The ALJ asked the VE to consider possible jobs for a hypothetical person of plaintiff's age, education and work background, who was limited to a range of light work[22] with regularly scheduled breaks that involved never climbing ladders, ropes or scaffolds or working at unprotected heights, and only occasional balancing, stooping, crouching, kneeling and fingering (Tr. 262). The ALJ also added the additional mental limitations of simple and routine tasks and only occasional interaction with the general public, coworkers and supervisors (Tr. 262).

The VE testified that such a hypothetical individual could work in jobs such as a small parts assembler, United States Department of Labor's Dictionary of Occupational Titles ("DOT") Code 706.684-022, with 92,000 jobs nationally, a laundry folder, DOT Code 369.687-018, with 397,000 jobs nationally and an

---

[22]The regulations define "light work" as work which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

inspector and hand packager, DOT Code 559.687-074, with 337,000 jobs nationally (Tr. 263).

The VE further testified that if such a hypothetical individual were limited to sedentary work with the above discussed limitations, such a hypothetical individual could work in jobs such as a document preparer, DOT Code 249.587-018, with 104,000 jobs nationally, a weight checker, DOT Code 737.687-026, with 14,000 jobs nationally and an assembler, DOT Code 713.687-018, with 7,000 jobs nationally (Tr. 264-65).

## III. Analysis

### A. Applicable Legal Principles

#### 1. Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); Lockwood v. Comm'r of Soc. Sec. Admin., 914 F.3d 87, 91 (2d Cir. 2019); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2014) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008). Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency."

Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d Cir. 2015), quoting
Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d
Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.
1999). "Even if the Commissioner's decision is supported by
substantial evidence, legal error alone can be enough to overturn
the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322,
328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application
of the correct legal principles to the record could lead to only
one conclusion, there is no need to require agency reconsidera-
tion." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla.
It means such evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Talavera v. Astrue, supra,
697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401
(1971). Consequently, "[e]ven where the administrative record
may also adequately support contrary findings on particular
issues, the ALJ's factual findings 'must be given conclusive
effect' so long as they are supported by substantial evidence."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),
quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

        2.  Determination
            Of Disability

A claimant is entitled to SSI or DIB if he can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. § 423(d)(2)(A). In addition, to obtain SSI or DIB, the claimant must have become disabled between the alleged onset date and the date on which he was last insured. See 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order), citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). In making the disability determination, the Commissioner must consider: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i), 416.920(a)(4)(i). If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R.

40

§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. See Henningsen v. Comm'r of Soc. Sec. Admin., 111 F. Supp. 3d 250, 264 (E.D.N.Y. 2015); 20 C.F.R. § 404.1520(c), 416.920(c). If he does, the inquiry at the third step is whether any of claimant's impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC. 20 C.F.R. § 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25. If he cannot, then the fifth step requires assessment of whether, given the claimant's RFC, he can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v), 416.920(a)(4)(iv). If he cannot, he will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v), 416.920(a)(4)(iv).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1), 416.945(a)(1). To determine RFC, the ALJ "'identif[ies] the individual's functional limitations or

restrictions and assess[es] . . . his work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §] 404.1545 . . . .'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996). The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[23] 20 C.F.R. § 404.1567, 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited further by nonexertional factors that restrict the claimant's ability to work.[24] See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps. Once the

---

[23]Exertional limitations are those which "affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b), 416.969a(b).

[24]Nonexertional limitations are those which "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching. 20 C.F.R. § 404.1569a(c), 416.969a(c).

claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work. Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so

narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411. Before an ALJ determines that sole reliance on the Grids is proper in determining whether a plaintiff is disabled under the Act, he must ask and answer the intermediate question -- whether the claimant has nonexertional limitations that significantly diminish his ability to work; an ALJ's failure to explain how he reached his conclusion to this question is "plain error". See Maldonado v. Colvin, 15 Civ. 4016 (HBP), 2017 WL 775829 at *21-*23 (S.D.N.Y. Feb. 23, 2017) (Pitman, M.J.); see also Bapp v. Bowen, supra, 802 F.2d at 606 ; St. Louis ex rel. D.H. v. Comm'r of Soc. Sec., 28 F. Supp. 3d 142, 148 (N.D.N.Y. 2014); Baron v. Astrue, 11 Civ. 4262 (JGK)(MHD), 2013 WL 1245455 at *19 (S.D.N.Y. Mar. 4, 2013) (Dolinger, M.J.) (Report & Recommendation), adopted at, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013) (Koeltl, D.J.). When the ALJ finds that the nonexertional limitations do significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which [the] claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks omitted); see Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983)

("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

B. The ALJ's Decision

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 10-21).

At step one, the ALJ found that plaintiff had not engaged in SGA since January 26, 2015 (Tr. 12).

At step two, the ALJ concluded that plaintiff suffered from the severe impairments of obesity, fibromyalgia, GERD, migraines, degenerative disc disease, ganglion cysts, hypertension, pericarditis, depression and anxiety (Tr. 12). The ALJ also concluded that plaintiff suffered from the non-severe impairments of colitis and irritable bowel sydrome (Tr. 13).

At step three, the ALJ found that plaintiff's impairments did not meet or medically equal the criteria of the listed impairments and that plaintiff was not, therefore, entitled to a presumption of disability (Tr. 13). In reaching his conclusion, the ALJ stated that he gave specific consideration to Listings 1.02, 1.04, 4.00, 12.04 and 12.06 (Tr. 13-14).

The ALJ then determined that plaintiff retained the RFC to perform light work with the following limitations:

> [plaintiff] must be afforded regularly scheduled breaks 15 minutes in the morning and afternoon and for 1/2

hour to 1 hour midday. He can occasionally climb ramps and stairs and never climb ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch and crawl and can frequently perform[] handling and fingering. He must avoid unprotected heights and hazardous machinery and is able to understand, remember and carry out simple routine tasks with occasional interaction with the general public, coworker[s] and supervisors (Tr. 15).

In reaching his RFC determination, the ALJ examined the opinions of the treating and consulting physicians and determined the weight to be given to each opinion based on the objective medical record (Tr. 19-20).

The ALJ afforded "great weight" to Dr. Felsenfeld's opinion that plaintiff had "moderate limitations in performing complex tasks and dealing with stress but otherwise only mild to no limitations in other areas of functioning" because it was "consistent with the conservative nature of care and [her] minimal clinical examination findings" (Tr. 19).

The ALJ afforded "some weight" to Dr. Ha's opinion that plaintiff "had overall mild exertional limitations" because it was supported by the clinical findings that plaintiff had a "normal gait," "full 5/5 strength" and "intact neurological findings," but Dr. Ha did not clearly define what mild limitations meant (Tr. 19).

The ALJ afforded "little weight" to Dr. Agastin's opinion that plaintiff "was able to perform less than a full

range of sedentary work"[25] because it was "inconsistent with the
record," "with repeated normal clinical examinations in treatment
reports," "with the findings of the consultative examination,"
with plaintiff's "conservative treatment" and with plaintiff's
ability to perform the "activities of daily living" (Tr. 19).

The ALJ afforded "little weight" to social worker
Weber's opinion that plaintiff "had various marked and extreme
mental limitations" because it was "inherently inconsistent with
the conservative nature of care given, the repeated normal mental
status examinations, the well supported opinion of the consulta-
tive examiner and [plaintiff's] daily living activities" (Tr. 19-
20).

The ALJ also considered treatment notes from Drs.
Keltz, Cole and Weigle, plaintiff's normal echocardiograms,
plaintiff's spinal MRIs and plaintiff's testimony in determining
plaintiff's RFC (Tr. 16-19). The ALJ found that while plain-

---

[25]Dr. Agastin's February 21, 2017 opinion did not explicitly
state that he believed that plaintiff could not perform sedentary
work. Rather, he opined that plaintiff could occasionally lift
and carry objects up to ten pounds, that plaintiff could only
sit, stand or walk for 30 minutes at a time and that plaintiff
could occasionally reach, push, pull, finger and handle objects,
climb stairs, stoop and balance and that plaintiff could never
climb ladders or scaffolds, kneel, crouch or crawl (Tr. 971-74).

The regulations define "sedentary work" as work which
"involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like files, ledgers,
and small tools" and occasional walking or standing. 20 C.F.R. §
404.1567(a).

tiff's medically determinable impairments could reasonably have caused his alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record (Tr. 18).

At step four, the ALJ concluded that plaintiff had no past relevant work (Tr. 20).

At step five, relying on the testimony of the VE, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given his RFC, age and education (Tr. 20-21).

C. Analysis of
   the ALJ's Decision

Construed liberally, plaintiff appears to argue that remand is warranted because (1) the ALJ violated the treating physician rule in determining plaintiff's RFC; (2) the ALJ showed unfair "hostility, aggravation, and irritation" towards plaintiff, requiring a new hearing before a different ALJ; (3) plaintiff received ineffective assistance from his attorney during his hearing and (4) plaintiff has "new and material evidence" that would have changed the ALJ's determination (Pl. Memo. 1 at 1; Pl. Memo. 2 at 1; Pl. Memo. 3 at 3-4). The Commissioner contends that the ALJ's decision was supported by substantial evidence and should be affirmed (Memorandum of Law in Support of the Commis-

sioner's Motion for Judgment on the Pleadings, dated Feb. 13, 2019 (D.I. 24) ("Def. Memo.")).

### 1. Step 3: The RFC

The ALJ found that plaintiff had the RFC to perform light work with the following limitations:

> [plaintiff] must be afforded regularly scheduled breaks 15 minutes in the morning and afternoon and for 1/2 hour to 1 hour midday. He can occasionally climb ramps and stairs and never climb ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch and crawl and can frequently perform[] handling and fingering. He must avoid unprotected heights and hazardous machinery and is able to understand, remember and carry out simple routine tasks with occasional interaction with the general public, coworker[s] and supervisors (Tr. 15).

The ALJ's RFC finding is supported by substantial evidence.

Plaintiff exhibited full muscle strength during 12 separate examinations during the relevant period (Tr. 669-72, 806-07, 857, 871-72, 876, 1350, 1362-363, 1367-368, 1382-383, 1389-390, 1502, 1528). Drs. Agastin and Ha both found that plaintiff had full range of motion in all extremities (Tr. 1367-368, 1502, 857). Drs. Cole and Weigle noted that plaintiff consistently had normal physical and neurological examinations, and that he exhibited only "mild restrictions" with his spinal range of motion (Tr. 671, 862, 868, 871-72, 876, 949-50, 1362-63, 1382-383, 1389-390).

On March 11, 2015, after an overall normal physical examination, Dr. Ha opined that plaintiff had no limitations on the use of his hands for fine and gross motor activity and that he had "mild limitations" with respect to heavy lifting, carrying, squatting, kneeling, crouching, climbing stairs, walking for long distances and prolonged sitting or standing (Tr. 858).

All of these findings are consistent with an RFC to perform light work. See Revi v. Comm'r of Soc. Sec., 16 Civ. 8521 (ER)(DF), 2018 WL 1136997 at *30 (S.D.N.Y. Jan. 30, 2018) (Freeman, M.J.) (Report & Recommendation), adopted at, 2018 WL 1135400 (S.D.N.Y. Feb. 28, 2018) (Ramos, D.J.) (ALJ's RFC finding of light work was consistent with consulting examiner's opinion that "plaintiff had only moderate lifting and carrying limitations"); Crews v. Astrue, 10 Civ. 5160 (LTS)(FM), 2012 WL 1107685 at *17 (S.D.N.Y. Mar. 27, 2012) (Maas, M.J.) (Report & Recommendation), adopted at, 2012 WL 2122344 (S.D.N.Y. June 12, 2012) (Swain, D.J.) (ALJ's RFC finding of light work was consistent with consulting examiner's opinion that plaintiff "suffered from only mild-to-moderate limitations with bending, lifting, carrying, . . . prolonged periods of sitting, standing, or climbing stairs."); Carpenter v. Astrue, 09-CV-0079 (RJA), 2010 WL 2541222 at *5-*6 (W.D.N.Y. June 18, 2010) (ALJ's RFC finding of light work was consistent with consulting examiner's opinion that

"plaintiff had only a moderate limitation in prolonged walking, standing, kneeling, and climbing.").

The objective evidence in the record and plaintiff's own testimony also supports the ALJ's determination. Plaintiff's April 22, 2015 lumbar spine MRI revealed a mild disc bulge with no herniations or stenosis, his April 16, 2015 chest X-ray revealed no evidence of acute pulmonary disease and his July 5, 2017 echocardiogram was normal (Tr. 1388, 1458, 1811-812). Plaintiff testified that he would walk his dog around his neighborhood for up to an hour and that he frequently went out to the movies and to go shopping (Tr. 251-52). He also stated that he did not have any difficulty picking up, handling or fingering objects, and that he was able to do his own laundry in the laundry room of his building (Tr. 251, 261).

Finally, the ALJ properly considered plaintiff's mental impairments when he limited plaintiff to "simple routine tasks with occasional interaction with the general public, coworker[s] and supervisors" as this was consistent with Dr. Felsenfeld's findings (Tr. 15, 850-51).

### a.   The Treating Physician Rule

Plaintiff appears to contend that the ALJ violated the treating physician rule in determining plaintiff's RFC because he argues that it was "abhorrent" that the "SSA's 'doctors' who only

[got] to see [him] once in a lifetime . . . were given the greatest weight in this case" (Pl. Memo. 2 at 1).

In considering the evidence, the ALJ must afford deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2);[26] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.). The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v.

---

[26]The SSA adopted regulations that alter the standards applicable to the review of medical opinion evidence with respect to claims filed on or after March 27, 2017. See 20 C.F.R. § 404.1520c. Because plaintiff's claim was filed before that date, those regulations do not apply here.

Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013); Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." Krull v. Colvin, 669 F. App'x 31, 32 (2d Cir. 2016) (summary order) (citation omitted); see also Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 7 (2d Cir. 2017) (summary order). The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a treating physician's determination on this issue if it is contradicted by the medical record. See Wells v. Comm'r of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).

The ALJ afforded "little weight" to the opinions of treating sources, Dr. Agastin and social worker Weber.

In his February 21, 2017 medical source statement, Dr. Agastin opined that plaintiff could only occasionally lift and

carry objects that weighed up to ten pounds and that he could only stand, sit or walk for 30 minutes (Tr. 971-72). Dr. Agastin further opined that plaintiff could occasionally reach, push, pull, finger and handle objects, climb stairs, stoop and balance, but that he could never climb ladders or scaffolds, kneel, crouch or crawl (Tr. 973-74). The ALJ found that this opinion was "not entitled to controlling weight" because it was inconsistent with the findings of Dr. Ha, the repeated normal physical examinations in the record, plaintiff's conservative treatment and plaintiff's daily activities (Tr. 19).

Dr. Agastin noted that plaintiff had normal physical and neurological examinations at nine separate appointments, including February 21, 2017 (Tr. 806-07, 1228, 1367-68, 1415, 1457-458, 1460, 1475, 1478-479, 1502). Dr. Agastin also found that plaintiff exhibited a full range of motion and muscle strength in all extremities on March 24, 2015 and December 19, 2016 (Tr. 1367-368, 1502). The only treatments Dr. Agastin recommended to plaintiff for his complaints of pain were medication, vitamins and home exercises. Thus, Dr. Agastin's medical source statement is inconsistent with his repeated normal clinical findings and his conservative treatment recommendations for plaintiff.

Dr. Agastin's opinion is also inconsistent with plaintiff's list of his daily activities which include frequently

54

walking his dog for an hour and going to the movies -- two activities that clearly require plaintiff to walk and sit for more than 30 minutes.

Finally, Dr. Agastin's opinion is inconsistent with the majority of other evidence in the record, including the repeated normal physical examinations by Drs. Cole, Yung, Weigle and Keltz, the consultative opinion of Dr. Ha and plaintiff's April 22, 2015 MRI.

Thus, the ALJ provided "good reasons" for affording less than controlling weight to Dr. Agastin's February 21, 2017 opinion because it was "contradicted by substantial evidence", and did not violate the treating physician rule. <u>Krull v. Colvin</u>, <u>supra</u>, 669 F. App'x at 32.

Plaintiff also maintains that the ALJ erred when he credited Dr. Felsenfeld's opinion over social worker Weber's with respect to his mental impairments (Pl. Memo. 2 at 1). Plaintiff's argument is somewhat confusing considering he testified at his hearing that the only impairment keeping him from working was his muscle pain from fibromyalgia and he maintained throughout the entire relevant period that he was not depressed and did not believe he needed psychiatric treatment. In any event, the ALJ did not violate the treating physician rule when he afforded "little weight" to social worker Weber's opinion that plaintiff

exhibited "various marked and extreme mental limitations" (Tr. 19).

During plaintiff's bi-weekly counseling sessions with Weber, she consistently noted that plaintiff exhibited appropriate affect and cognitive functioning, and that he appeared oriented and alert to time and place (Tr. 997-1177). While other treating and consultative physicians noted plaintiff's symptoms of depression, all of them also found that plaintiff was oriented, alert and capable of understanding simple instructions and directions. Plaintiff has never been hospitalized for any psychiatric treatment or suffered from any periods of severe decompensation. At his consultative examination with Dr. Felsenfeld, plaintiff was appropriately dressed and groomed, his thought process was coherent and his memory was intact (Tr. 849-50). Dr. Felsenfeld noted that plaintiff's concentration and attention were "mildly impaired" and that he had "mild limitations" with relating adequately with others (Tr. 850). This assessment was consistent with plaintiff's normal mental examinations and were accounted for by the ALJ in his RFC determination.

Thus, the ALJ also provided good reasons for crediting Dr. Felsenfeld's opinion over social worker Weber's opinion.

2. Plaintiff's Claim of Hostility
   on the Part of the ALJ

Plaintiff next contends that he is entitled to a new hearing before a different ALJ because ALJ Stracchini showed unfair "hostility, aggravation, and irritation" towards him when he attempted to ask his attorney a question during the hearing (Pl. Memo. 3 at 3-4).

"[W]hen the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate." Sutherland v. Barnhart, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). "[A]lthough due process demands impartiality by administrative adjudicators, courts 'must start . . . from the presumption that [these adjudicators] are unbiased.'" Harris v. Colvin, 14-cv-65 (JMC), 2015 WL 282014 at *4 (D. Vt. Jan. 22, 2015) (second and third alterations in original), quoting Schweiker v. McClure, 456 U.S. 188, 195 (1982). "'This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification [; b]ut the burden of establishing a disqualifying interest rests on the party making the assertion.'" Harris v. Colvin, supra, 2015 WL 282014 at *4 (alteration in original), quoting Schweiker v. McClure, supra, 456 U.S. at 195-96. In order to show that an ALJ's bias resulted in the denial of a fair hearing, the claimant must show that the ALJ exhibited a

"deep-seated favoritism or antagonism that would make fair judgment impossible." <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994); <u>accord</u> <u>Whitfield v. Astrue</u>, <u>supra</u>, 476 F. App'x at 409.

Not only does plaintiff not come close to meeting this standard, but he grossly misrepresents the incident that he claims gives rise to the ALJ's alleged hostility. During plaintiff's hearing, while the ALJ was questioning the VE, plaintiff interrupted the proceedings and asked if he could say something (Tr. 263-64). After plaintiff's attorney explained to him that the ALJ was questioning another witness, the ALJ actually paused the proceedings and explained to plaintiff what the VE's role in the hearing was and what she would be testifying to (Tr. 263-64). The ALJ also informed plaintiff that plaintiff's attorney would be permitted to ask the VE questions once the ALJ had finished and that plaintiff would be permitted to speak with his attorney before this cross-examination took place (Tr. 266). Plaintiff took full advantage of this opportunity and proceeded to have an off the record conversation with his attorney before the cross-examination of the VE began (Tr. 266).

Thus, plaintiff has clearly not met his burden that the ALJ's purported bias resulted in the denial of a fair hearing.

### 3. Plaintiff's Ineffective
   ### Assistance of Counsel Claim

Plaintiff claims that he is entitled to remand, claiming that he was "grossly misrepresented" during his hearing because his attorney refused to submit certain medical records and "made no attempt to argue the validity of [plaintiff's] being disabled based on all of [his] conditions as a whole" (Pl. Memo. 1 at 1; Pl. Memo. 2 at 1).

As the Second Circuit recently held, because social security appeals are "civil case[s] in which [plaintiff] does not face the prospect of imprisonment . . . the Sixth Amendment right to counsel does not apply, and [an] ineffective assistance of counsel claim is not cognizable" on appeal. Rotolo v. Berryhill, 741 F. App'x 851, 853 (2d Cir. 2018) (summary order) (quotation marks and citation omitted); accord Johnson v. Barnhart, 04 Civ. 5574 (HB), 2005 WL 2993933 at *3 (S.D.N.Y. Oct. 7, 2005) (Baer, D.J.) (no right to competent counsel in social security proceedings).[27]

---

[27]I note that district court opinions in this Circuit have disagreed as to whether ineffective assistance claims may be raised in the context of social security proceedings. Compare Johnson v. Barnhart, supra, 2005 WL 2993933 at *3, with Prestia v. Colvin, 13-CV-01559 (MAD), 2015 WL 1417738 at *3 (N.D.N.Y. Mar. 27, 2015) (reaching merits of ineffective assistance claim in social security claim, while noting that right "falls well below" the standard in criminal cases); see also Miller v. Berryhill, 17-cv-1734 (JCH), 2018 WL 6381458 at *5 (D. Conn. Dec.
(continued...)

59

In any event, even if this claim were cognizable, plaintiff's argument appears to be meritless. Contrary to plaintiff's contentions, his counsel argued to the ALJ at length about the complexity of fibromyalgia and how plaintiff's impairments as a whole rendered him disabled (Tr. 277-79). Furthermore, plaintiff's counsel obtained medical records from 13 different providers and even requested a supplemental hearing when he obtained additional records. As discussed in detail below, any additional records that were not submitted to the ALJ were not material to the AlJ's determination.

Thus, plaintiff's ineffective assistance of counsel claim does not entitle him to remand.

### 4. Plaintiff's New Evidence

Plaintiff attached the following medical evidence to his third submission that he claims is "new and material": (1) handwritten treatment notes from Montefiore New Rochelle Rheumatology Clinic documenting four visits from June 19, 2017 through April 16, 2018, (2) a "Disability Impairment Questionnaire" from Dr. Mark Burns, dated November 21, 2017 and

---

[27](...continued)
6, 2018) (discussing the split among district courts).

(3) a "Residual Functional Capacity Form" from Dr. Agastin, dated February 15, 2016 (Pl. Memo. 3 at 12-34).[28]

The Act permits a reviewing court to remand a case to the Commissioner "upon a showing that there is new evidence," but only if that new evidence is "material" and there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); accord Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996); Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988); see also Diaz v. Colvin, 14 Civ. 2277 (KPF), 2015 WL 4402941 at *17 (S.D.N.Y. July 19, 2015) (Failla, D.J.) ("The Act sets a stringent standard for remanding based on new evidence alone."). New evidence is considered "material" if "it is (a) relevant to [plaintiff's] condition during the time period for which benefits were denied; (b) probative; and (c) reasonably likely to have influenced the Commissioner to decide [plaintiff's] application differently." Henderson v. Berryhill, 342 F. Supp. 3d 396, 403 (W.D.N.Y. 2018), citing Mulrain v. Comm'r of Soc. Sec., 431 F. App'x 38, 39 (2d Cir. 2011) (summary order).

With the exception of one visit to the Montefiore New Rochelle Rheumatology Clinic, plaintiff's new evidence relates to the time period for which benefits were denied; however, it is

_____

[28]Plaintiff also references dental and physical therapy records in his argument, but these records were not submitted to the court (Pl. Memo. 1 at 1; Pl. Memo. 3 at 3-4).

not reasonably likely that these records would have changed the ALJ's determination.

Plaintiff visited Montefiore New Rochelle Rheumatology Clinic on June 19, 2017, August 14, 2017, September 18, 2017 and April 16, 2018 (Pl. Memo. 3 at 12-19).[29] While the handwritten treatment notes in these records are largely illegible, it appears that plaintiff was being treated for his muscle pain related to his fibromyalgia (Pl. Memo. 3 at 12-19). It is unlikely that these four visits would have changed the ALJ's determination because the ALJ was already well aware of plaintiff's long history of fibromyalgia through the treatment records of Drs. Agastin, Wachs and Weigle. Furthermore, the Montefiore New Rochelle Rheumatology Clinic treatment notes do not indicate that plaintiff's condition was significantly worse than what the ALJ found. Plaintiff reported muscle pain in his calves and forearms and the clinic's physicians recommended the conservative treatments of medication, home exercises and physical therapy (Pl. Memo. 3 at 12-19). This is essentially what the hundreds of pages of treatment notes from Drs. Agastin, Wachs and Weigle showed and, thus, there is no reasonable possibility that these records would have altered the ALJ's decision. See Henderson v.

_____

[29]While the Montefiore New Rochelle Rheumatology Clinic records are stamped by Dr. Mark Burns, a rheumatologist, they also contain signatures from other physicians. Thus, it is unclear who actually examined plaintiff during these visits.

Berryhill, supra, 342 F. Supp. 3d at 403 (plaintiff not entitled to remand where the new evidence he presented did "not suggest that [his] symptoms were worse during the period under consideration than the ALJ contemplated").

It is also unlikely that the November 21, 2017 medical source statement from Dr. Burns would have changed the ALJ's determination. As noted above, it is unclear what, if any, treatment relationship Dr. Burns had with plaintiff. Moreover, Dr. Burns' opinions are consistent with the ALJ's RFC finding of light work. Dr. Burns opined that plaintiff could frequently lift and carry objects up to ten pounds and occasionally lift items up to 20 pounds, and that he had no significant limitations with reaching for, handling or fingering objects (Pl. Memo. 3 at 24-25). See 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds.")

Finally, there is no reasonable probability that the February 15, 2016 medical source statement from Dr. Agastin would have changed the ALJ's determination. While Dr. Agastin opined that plaintiff could rarely reach for, handle or finger objects, and that he could only lift or carry items up to five pounds, this opinion is inconsistent with Dr. Agastin's treatment records and his other medical source statements (Pl. Memo. 3 at 31). As discussed at length above, Dr. Agastin consistently found that

plaintiff's physical and neurological examinations were normal throughout 2015, 2016 and 2017, and specifically found that plaintiff exhibited full range of motion and muscle strength in all extremities on March 24, 2015 and December 19, 2016 (Tr. 806-07, 1228, 1367-68, 1415, 1457-458, 1460, 1475, 1478-479, 1502). In his February 21 and November 20, 2017 medical source statements, Dr. Agastin opined that plaintiff did not have any "significant limitations" with reaching for, handling or fingering objects, and that he could lift and carry objects up to ten pounds (Tr. 54-55, 971-74).

Because of these inconsistencies, it would have been proper for the ALJ not to afford controlling weight to Dr. Agastin's February 15, 2016 opinion and, thus, it is unlikely that this new evidence would have changed the ALJ's determination.

IV. Conclusion

Accordingly, for all the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted and plaintiff's motion is denied. The Clerk of the Court is

respectfully requested to mark D.I. 23 and D.I. 26 closed, and respectfully requested to close the case.

Dated:   New York, New York
         September 23, 2019

                              SO ORDERED

                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to

All Counsel